ANDERSON-ROSS FLOORS, INC., Plaintiff-Appellee, *v.* SCHERRER CONSTRUCTION CO., INC., *et al.*, Defendants-Appellants.

Second District   No. 77-106

Opinion filed August 1, 1978.

Conzelman, Schultz & Snarski, of Waukegan, for appellants.

Hall, Meyer, Fisher, Holmberg & Snook, of Waukegan and Jenner & Block, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Anderson-Ross, Inc., as a subcontractor, filed suit against the general contractor, Scherrer Construction Co., Inc., the architectural firm of Orput-Orput, Inc., and the construction manager for the architect Marshall S. Stevens, to recover payment for the installation of a gymnasium floor in a grade school. Following a bench trial judgment was entered in favor of plaintiff and against the general contractor for $5180 and costs and Scherrer appeals. No judgment was entered against the other defendants.

In issue is whether the plaintiff performed in accordance with his agreement "to the satisfaction of the architect" and whether recovery may be had when no architect's certificate has been issued and the school board owner has refused to accept the work.

The record of the trial is before us on a stipulated report of proceedings, no actual transcript having been prepared. Robert E. Ross, the president of the plaintiff company, testified that Stevens was present as the representative of the architect during the installation of the flooring, had an opportunity to observe the work but made no adverse comment. He said that his corporation had been installing floors for fifteen years during which time between 300 and 400 of such floors had been laid. He explained the "Robbins lock-type floor system" which was

the method he used. In February or March of 1971 he had the following conversation with Marshall Stevens:

"Q(by ROSS): What's the matter, MARSHALL?

A(by MARSHALL STEVENS): There are complaints of spaces between the boards.

Q(by ROSS): Sure there are a few but, you are bound to get them.

A(by MARSHALL STEVENS): Yes, BOB, it looks all right to me."

On cross-examination the witness testified that he did not return to the site after March of 1971 although the Scherrer Construction Company requested meetings.

Marshall Stevens testified as an adverse witness to his employment as a construction manager and to the fact that he was not a registered architect. He said he had a conversation with Ross at the site in the early part of 1971 but he could not remember whether he had told Ross that in his opinion the floor was typical and adequate and he would recommend payment. He identified a letter which he wrote to the general contractor on March 19, 1971, which states in part:

"We have reviewed your gym floor installation thoroughly and cannot recommend that the Owner accept and make payment until the current deficiencies are corrected. The floor throughout must have tight end joints and side horizontal joints no matter what humidity may exist in the areas. You are directed to remove all portions of floor and replace in manner to meet these requirements and all of normal requirements."

Stevens also identified a letter which he wrote to the school board on January 25, 1971, which included the following statement:

"Several specific locations were noted with cracks of ⅛" in width between boards. It was felt that normal expansion of boards in unheated months would help to close these gaps.

The Architect, Marshall S. Stevens, agreed to release of payment to Scherrer Construction Company as requested in their Periodic Estimate 12—which is 90% of wood floors—retaining 10% or $1,590.00. This action automatically releases 'hold action' of Orput-Orput letter to Scherrer Construction Company of January 8, 1971. This decision was based upon fact that General Contractor guarantees this floor for one (1) year and flooring contractor guarantees for five (5) years—during which time it was felt that any minor problems would be corrected."

Stevens also testified that it was possible to have tight joints at all times. He further testified that he had observed the spaces open and close over a

period of time and also that the last time he visited the gymnasium it was being put to its intended use. He said that he had advised the school board that the spaces would not adversely affect its use and that he knew of no repairs having been made to the floor.

Professor Henry L. Mikolajczyk, testified on behalf of the plaintiff, that he had been teaching for 31 years, and that for the past 12 years he was a professor at the University of Illinois in the matter of the technical nature of materials; that he was a registered architect in engineering in charge of design of all Chicago facilities for the University of Illinois; that he did research in the area of materials and building construction materials and was a consultant architect, a member of the Illinois Society of Architects.

Professor Mikolajczyk testified that he had examined the second grade maple used in the floor construction and its moisture content. The stipulated substance of his testimony included the following:

"He further stated that there was a relationship between the air and the wood, and that wood absorbs moisture and gives off moisture, depending upon the relative humidity in the heated building; that if no humidification equipment in the building is present, then humidity is twenty (20%) percent or less; he examined the Antioch Upper Grade School's specifications and found no humidification equipment; that to have an eight (8%) percent moisture content you need forty-five (45%) percent relative humidity and that in heated buildings that twenty (20%) percent relative humidity the moisture content of the wood would be about four (4%) percent; that if the floor was laid with an eight (8%) percent moisture content there would be a forty (40%) percent loss in the moisture content and in twelve (12) inches of second grade maple board that shrink moisture loss would be approximately three sixteenths (3/16) of an inch or less or to relate the matter to width of coins, it would allow 2-five cent pieces to be put together between the cracks in the boards with space left over.

The witness further testified that he visited the Antioch Grade School on June 23, 1976, at the end of the heating season and close to its dryest maximum.shrinking potential. He spent one and one-half (1-½) hours inspecting the floors. The witness further identified Plaintiff's Exhibit No. (13), being a picture of the floors representing the spaces between the floors allowing coins to be inserted therein. The witness further testified that generally maple floors will expand when the humidity increases and shrinks when the humidity decreases; that there is no uniformity but would depend on what part of the log the wood was cut from. The witnesses [sic] asked if it were possible to have tight ends regardless of the humidity and the witness answered, 'No'. The

witness further testified that there was no humidification equipment present at the time he made the examination* * *."

The subcontract was also placed in evidence showing a contract price of $10,500. As pertinent the subcontract included the following:

"(a). To furnish all materials and perform all labor for Antioch Upper Grade School-Antioch, Illinois in accordance with the drawings, plans, and specifications prepared by Orput & Orput Rockford, Illinois, hereinafter called the architect, the receipt of a true and complete copy of said drawings, plans, and specifications being acknowledged by the Sub-Contractor and being incorporated herein as though fully set forth at length, as the same pertains to the Sub-Contractor as follows, to-wit: Division 9-E Gym Floor furnished and installed per plans and specifications. Also includes fir flooring on stage #C105, sanded and finished.* * *

(c). Payments to be made on or about the 10th day of each month at the rate of 90% of the value of the work erected in place during the preceding month, as determined by the Contractor or the architect and the remaining 10% within fifteen days after the completion and acceptance of this work."

Neither the contract between Scherrer and the school board nor the plans and specifications have been made part of the record.

Essentially Scherrer argues that plaintiff's action must fail because performance under the agreement was to be to the satisfaction of the architect and he was not satisfied; and further that the acceptance by the school board was required but not obtained with the result that the contractor has not been paid for the disputed portion of the contract. Scherrer further argues that plaintiff is not entitled to recover on the basis of substantial performance arguing that the record shows gross defects. Plaintiff in turn argues that the floor was installed to the satisfaction of the architect but that he wrongfully withdrew his approval presumably because the school board rejected the work after the architect's representative had agreed to release payment. Plaintiff further argues that it is not barred from recovery since the architect acted unreasonably and without exercising his independent judgment when he refused to issue a certificate of approval. It also argues that the installation is in accordance with the requirements of the contract and that there is no support in the record for the claim that the school board must approve the work as a condition of recovery by the subcontractor.

■■ ■ The meaning of the phrase in a construction contract that a claimant must fulfill his contract "to the satisfaction of" another has been construed to require a judgment reasonably, and not merely arbitrarily, exercised. (*Erikson v. Ward*, 266 Ill. 259, 263-65 (1914).) An architect who

inspects the work and accepts it as being in compliance with the contract but refuses without good reason to deliver his certificate is guilty of bad faith which will excuse the certificate. (*Fitzgerald v. Benner,* 219 Ill. 485, 499 (1906). See also *Badger v. Kerber,* 61 Ill. 328, 330 (1871).) If a certificate is withheld because the owner has directed the superintendent of construction not to issue it where it otherwise would be properly issued the failure to comply with that exact term is waived. (*Masek v. Chmelik,* 169 Ill. App. 589, 592 (1912).) It has been held that "it is the architect's judgment, not his arbitrary will, that the contract makes conclusive on the questions submitted to his decision." *County of Cook v. Harms,* 108 Ill. 151, 161 (1883).

These long-established rules in the Illinois cases are consistent with the Restatement of Contracts in which the meaning of the term "to the satisfaction of the architect" is specifically addressed:

"Where a certificate of an architect, surveyor or engineer is a condition precedent to a duty of immediate payment for work, the condition is excused if the architect, surveyor or engineer

(a) dies or becomes incapacitated, or

(b) refuses to give a certificate because of collusion with the promisor, or

(c) refuses to give a certificate after making examination of the work and finding it adequate, or

(d) fails to make proper examination of the work, or

(e) fails to exercise an honest judgment, or

(f) makes a gross mistake with reference to facts on which a refusal to give a certificate is based." (Restatement of Contracts §303 (1932).)

See also Corbin on Contracts §650, at 618 (1952).

■■ It is first noted that the record does not include the drawings, plans and specifications against which we might measure the evidence of plaintiff's performance. In a sense this may be viewed as irrelevant since defendant does not claim a failure to comply with these items nor did the architect so testify.[1] Defendant alleges instead a failure to comply with the provision that the architect must be satisfied. While the defendant argues that the plaintiff was required to install a floor with "tight joints" this phrase is not a part of the record as an element of the contract but rather is the judgment of the architect. It appears, however, from the testimony of Professor Mikolajczyk, which the trier of facts could find more credible than that of Stevens to the contrary, that tight joints were not possible during all seasons without humidification equipment. He

---

[1] We do not consider the theory of substantial performance because the record does not indicate that the floor installation failed to conform to the drawings, plans and specifications. The sole issue is whether the architect wrongfully withheld his approval.

testified that absent humidification equipment there would be a space of approximately 3/16ths of an inch in each 12-inch section of the maple flooring. He also testified that it would be impossible to have tight ends as specified in Stevens' letter regardless of humidity. The trial court could conclude from the evidence that Stevens made a gross factual error with respect to the humidity and that his requirement that the floor have "tight end joints" was impossible.

The trial court could also conclude from the record that the certificate of the architect was excused because Stevens, after examining the work and finding it adequate, subsequently refused to issue a certificate. There is testimony in the record from Ross that there was a discussion between Stevens and Ross relative to the school board's complaints in early 1971. Ross testified that Stevens stated at that time "It looks all right to me." While Stevens could not remember the conversation the trial court could consider this as an implied admission by him that he found the work adequate. See *Neagle v. Herbert,* 73 Ill. App. 17, 26 (1897).

It also appears that Stevens was satisfied with the floor installation on January 25, 1971, except as to what he characterized as "minor problems," when he stated in a letter that he "agreed to release payment" for the wood flooring. Under these circumstances the trial court could conclude that Stevens initially found the work to be adequate and subsequently refused to issue the certificate. *Fitzgerald v. Benner,* 219 Ill. 485, 492-93 (1906); Restatement of Contracts §303(c) (1932).

Defendant has argued that there is testimony that two nickels could be inserted in some of the cracks in the floor and that the floor is patently unsuitable for use by school children. However, defendants' own witness Stevens testified that he advised the school board that the use of the floor would not be adversely affected by the cracks. He further testified that he observed the floor being put to its intended use. And the record shows that the floor has been in use.

■■ We are not persuaded by defendant's contention that the contract required acceptance by the school board. Defendant relies on section 2(c) of the contract which in substance provides that the payments will be made each month at the rate of 90% of the value of the work in place during the preceding months as determined by the contractor or architect; with the provision that the remaining 10% is due 15 days after the completion and "acceptance of this work." It is apparent that the phrase "acceptance of the work" applies to acceptance by the architect and not to the acceptance by the owner. Nor are we persuaded by the defendant's additional argument that since the subcontract is controlled by the general contract, the school board's refusal to pay the general contractor indicates that the general contractor should not be required to pay the subcontractor. As previously noted the general contract is not

720

before us and, in any event, there is nothing in the record to indicate that plaintiff's work was conditioned on acceptance of the work by the owner in addition to approval of the architect.

The judgment of the trial court is affirmed.

Affirmed.

WOODWARD and NASH, JJ., concur.