**In re Richard L. & Ruth ROTH, Debtors.**

**Richard L. ROTH, Plaintiff and Counterdefendant,**

**v.**

**H.R. PHILIPSBORN & CO., a corporation, Defendant and Counterplaintiff.**

**Bankruptcy No. 82 B 656. Adv. No. 83 A 1136.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 7, 1986.

Allan Goldberg, Allan Goldberg, Ltd., Chicago, Ill., for plaintiff and counterdefendant.

Daniel Cummings, Rothschild, Barry & Myers, Chicago, Ill., for defendant and counterplaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT ORDER THEREON

JACK B. SCHMETTERER, Bankruptcy Judge.

After trial of this adversary case, the Court having taken evidence and testimony and considered all evidence admitted and the arguments of counsel, the parties having rested and proceedings being closed, this Court now makes and enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Plaintiff/Debtor RICHARD L. ROTH ("Roth") was an experienced developer and well-acquainted with the custom and practices in the construction finance industry.

2. On August 4, 1978, Roth applied to Defendant H.F. PHILIPSBORN & CO., a corporation ("Philipsborn") for a $2 million end loan (permanent mortgage loan) and a $2 million construction loan.

3. The terms and conditions of the end loan and construction loan are contained in the application.

4. Roth read and understood the application prior to his signing it.

5. The application states and Roth was aware that Philipsborn would obtain end loan funds from another lender for the use of Roth.

6. In this instance, Philipsborn obtained an end loan for Roth from The Manufacturers Life Insurance Company ("ManuLife").

7. ManuLife committed to make Philipsborn for the use of Roth an end loan subject to certain conditions contained in its letter of August 22, 1978.

8. Philipsborn committed to make an end loan and construction loan to Roth on September 7, 1978.

9. Philipsborn's commitment to Roth was subject to Philipsborn's conditions contained in its letter of September 7, 1978, and ManuLife's letter of August 22, 1978.

10. Roth knew and understood that his mortgage loan was subject to the conditions contained in the Philipsborn letter of September 7, 1978 and the ManuLife letter of August 22, 1978.

11. Roth's signified his knowledge of the terms and conditions in the Philipsborn letter of September 7, 1978 and the ManuLife letter of August 22, 1978 by countersigning the Philipsborn letter.

12. When Roth applied for construction financing, he envisioned that the Farmgate II project would take one year to construct.

13. Philipsborn Equities, Inc. and H.F. Philipsborn & Company were both owned by IC Industries, Inc.

14. Equities made different types of loans and invested in different types of projects than did Philipsborn.

15. Roth applied to Equities for a $540,-000 land loan in addition to the construction loan from Philipsborn in order to have sufficient funds to complete the project.

16. Equities turned down Roth's application for a land loan and thereby no contract was entered into between Roth and Equities for a land loan.

17. A "holdback" is a sum of money which the end lender does not disburse to the developer at the time the end loan is funded, unless (or until) a certain contingency is met.

18. The end loan included a $300,000 holdback for rental performance.

19. Pursuant to the terms of the rental performance holdback, Roth had to achieve $275,000/year in arms-length leases by May 1, 1980 in order to qualify to receive the funds held back by ManuLife.

20. In the event that Roth did not meet his rental performance by May 1, 1980,

Roth's end loan would be for only $1.7 million.

21. End loans and construction loans are both mortgages on the property.

22. ManuLife's commitment required that it have a first mortgage on the property, the Farmgate II shopping center.

23. Philipsborn's construction commitment required that it have a first mortgage on the property, including the land on which the center was to have been built, at the time the construction loan opened.

24. A loan is "opened" when the developer satisfies the construction lender that he has all the necessary documentation to obtain the loan and he has a sufficient amount of working capital, including the construction loan, to complete the project.

25. In the industry, the terms "opening" a loan and "closing" a loan are sometimes used interchangeably to signify the point where all documentation has been exchanged by the lender and the developer, and the developer has received final approval to draw funds from the total loan amount.

26. The term "take out" is used in the industry to describe the act of the end lender in paying the construction lender the amount of the construction loan.

27. In the ordinary course of business, the end lender takes out the construction loan at the time the end loan is funded.

28. In the ordinary course of business, a construction lender will not lend to a developer a sum in excess of the end loan funds which will be tendered to the developer at closing.

29. A "gap" is the term used to signify the difference between the amount of a construction loan and the cost of the project.

30. A gap loan can be made to a developer to enable him to pay costs during the period of time that the end lender is retaining funds pursuant to a holdback contingency.

31. The size of the gap would, in this instance, be the size of the holdback.

32. A construction loan generally is not paid in one sum.

33. A construction loan is paid as the developer brings to the construction lender his statements and invoices for work completed.

34. A "contractor's sworn statement" is given by a subcontractor to a contractor, or a contractor to the owner, to signify that all amounts due and owing that subcontractor or contractor have been paid.

35. A construction lender may also reimburse a developer for prepaid expenses from the proceeds of a construction loan.

36. In the industry, the term "to be in balance" is used to signify that the developer has sufficient funds, including the total amount of the loan, to complete the project.

37. In the industry, it is standard practice for the construction lender to have the developer expend his own funds on the project before opening the construction loan.

38. This expenditure is the developer's equity in the project.

39. To have been in balance in the case at bar, Roth would have to have had a sufficient amount of available cash or prepaid expenses to equal the difference between the estimated costs of construction and the loan amount available to be disbursed.

40. Roth never demonstrated that he had sufficient equity or funds in addition to what would have been disbursed under the Philipsborn construction loan to complete the project.

41. Philipsborn's refusal to disburse construction loan funds was commercially reasonable in light of Roth's failure to be in balance.

42. As of June 28, 1979, Roth did not have signed leases for space generating $275,000 annual income.

43. Since Roth had not met the rental performance and therefore was not entitled to the rental performance holdback in his

end loan, he was only eligible for a $1.7 million end loan.

44. Since Roth was only eligible for a $1.7 million end loan, he was only eligible for a $1.7 million construction loan.

45. The end loan commitment in the case at bar originally was to expire on September 1, 1979.

46. At the request of Philipsborn, the ManuLife end loan commitment was extended until October 1, 1979.

47. At the second request of Philipsborn, the ManuLife end loan commitment was extended to December 1, 1979.

48. At Roth's request, Philipsborn asked ManuLife for an extension of its December 1, 1979 completion date for delivering the completed Farmgate II shopping center.

49. ManuLife refused to extend the completion date.

50. Philipsborn had no duty to Roth to extend its commitment to make a construction or an end loan past the date that ManuLife committed to make an end loan.

51. In the ordinary course of business, a developer must produce to an end lender certain documentation before an end lender will take out the construction loan and offer permanent financing on the subject property.

52. In the ordinary course of business, at the time the end loan is funded and the end lender takes out the construction loan, the developer must own the project free of liens.

53. In the ordinary course of business, no end or construction lender will advance funds to a developer where there is a lien on the lands or buildings, or a portion thereof, superior or subordinate to the lien which will attach to the property after the loan is made.

54. Among the terms of the ManuLife end loan commitment which Roth accepted were that: (1) there be an easement agreement between the Phase II property and the Phase I property which was already constructed; (2) ManuLife be furnished with a set of final plans and specifications; (3) Roth was to furnish ManuLife an up-to-date survey and zoning approval; and (4) Roth was to have title to the property in fee simple.

55. In order to prepare the mortgage papers, on September 22, 1978, Philipsborn asked Roth in writing to furnish Philipsborn with: (1) a certified copies of the trust agreement covering the mortgage or trust; (2) Torrens owner's duplicate certificate of title; (3) title report or title policy which shall set forth the description of the premises to be mortgaged; (4) easement agreement for the road separating the subject property from the Phase I part of the shopping center and adjoining to the south; (5) a plat of survey indicating a legal description as in the title report and showing the easement for the benefit of the subject property which is to be mortgaged; (6) a copy of the building permit (the authorization or permit from the local authority to construct the improvements); (7) Philipsborn's form of a contractors' sworn statement, which was to be completed showing the names and addresses of all subcontractors; and (8) an executed counterpart of all leases.

56. Roth did not submit to Philipsborn a Torrens owners duplicate certificate of title.

57. Roth did not submit to Philipsborn a plat of survey indicating the legal description as in the title report and showing the easement for the benefit of the subject property.

58. Roth did not submit to Philipsborn a signed easement agreement at any time prior to December 1, 1979.

59. Roth did not submit to Philipsborn a contractor's sworn statement until after June 28, 1979.

60. The Philipsborn commitment, which Roth countersigned, required that ManuLife be furnished with a set of final plans and specifications for its approval prior to commencement of construction.

61. Philipsborn was not furnished with such plans and specifications prior to construction.

62. Roth did not submit to Philipsborn a copy of the building permit, if at all, until some date after September 10, 1979.

63. If Roth did submit a copy of a building permit to Philipsborn on or after September 10, 1979, that permit was only for the foundation of the shopping center.

64. The title report for the property upon which Farmgate II was to have been built contained several exceptions which were never waived by the title company or caused to be removed by Roth.

65. Roth never responded to the letter of October 17, 1978 from Philipsborn's attorney, John Coffey, which noted that these exceptions had to be waived or removed before Philipsborn could fund the construction loan.

66. Roth did not own prior to December 1, 1979 approximately half of the land upon which the Farmgate II shopping center was to have been built.

67. Roth had an option to purchase the portions of the land under the shopping center which he did not own.

68. On December 1, 1976, Roth obtained a first mortgage loan from American Heritage Savings and Loan Association to purchase part of the land upon which the Farmgate shopping center, Phase II would be built.

69. Prior to August 3, 1978, American Heritage directed its attorney to begin foreclosure proceedings against Roth for failure to make his monthly payments on the mortgage.

70. Roth had not paid his architects, Barton Barrow of Architects and Planners International ("API") for work performed on jobs API did for Roth prior to the date of Roth's application for mortgage and construction loans.

71. Invitations to bid for the construction of the project were not issued until January, 1979.

72. Robert Gledhill of Versailles Builders of Illinois submitted his bid to API on February 16, 1979.

73. Mr. Gledhill stated in that bid that construction of the shopping center would take ten months if construction began within 45 days of the date of his letter.

74. Construction time would have been longer if Versailles Builders had to work during winter months.

75. ManuLife would not have accepted the building and purchased the construction loan until it had received written certification from a qualified inspector that all construction had been completed in accordance with the plans and specifications which were submitted to Philipsborn and ManuLife with the application.

76. Versailles Builders could not have completed Farmgate II to ManuLife's specifications if it had begun work as of the date of its contract with Roth, August 20, 1979.

77. After a construction project was completed, there was certain additional documentation required before the project and construction loan could be delivered to an end lender.

78. In the ordinary course of business, it took a developer and Philipsborn approximately 30 to 60 days to complete the documentation necessary to deliver a project and a construction loan to ManuLife.

79. Philipsborn notified Roth in July, 1979 that it would not fund the construction loan.

80. In light of Roth's performance and the small amount of time remaining to complete the project, Philipsborn's action was commercially reasonable.

81. Philipsborn did not tell Roth in March, 1979 that it would not fund the construction loan.

82. Even if Philipsborn had made the decision not to fund the construction loan as of March, 1979, that decision would have been commercially reasonable in light of the fact that too little time remained to

complete the construction and deliver the construction loan to ManuLife.

83. Since 1949, the Roth transaction was the only instance where Philipsborn had committed to fund a construction loan and then did not because of the borrower's inability to comply with certain conditions precedent to funding the loan.

84. The Note on which the Philipsborn counterclaim is based was not intended by the parties to be paid unless and until the construction loan opened, but that loan never opened.

### Conclusions of Law

1. The parties through their respective counsel have stipulated that this cause be tried to final judgment by this Court. Since this cause is related to a Bankruptcy case pending herein, this Court has jurisdiction over the subject matter and parties. 28 U.S.C. § 157(c)(2); *In Re K-Rom Const. Corp.*, 46 B.R. 745, 749 (D.C.1985); *In Re Energy Sav. Center, Inc.*, 54 B.R. 100, 102 (Bkrtcy.1985); and General Reference Order from the United States District Court, Northern District of Illinois.

■ 2. Philipsborn's acceptance of the Application for Mortgage on September 7, 1978 constitute, *inter alia,* a commitment by Philipsborn to provide construction loan financing for the Farmgate Shopping Center Phase II.

3. Philipsborn's construction loan commitment was a binding contract between Roth and Philipsborn to borrow and to lend, respectively. *Applegate-Leason & Co. v. Reilly*, 61 Ill.App.3d 120, 18 Ill.Dec. 499, 377 N.E.2d 1135 (1970).

■ 4. The contract between Roth and Philipsborn that is at issue in this action is Exhibit 19, as amended by Exhibit 43. In order for the construction loan to be funded, Roth had the duty under that contract to be in balance on the loan and to submit certain documentation to Philipsborn. These conditions precedent were not fulfilled by Roth, and therefore Philipsborn had no duty to fund the construction loan.

Illinois law as to conditions precedent states:

> It is an elementary rule of contract law that a condition precedent must be performed or no contractual liability results. A condition precedent is one which must be performed before a contact becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform.

*Godare v. Sterling Steel Casting Co.*, 103 Ill.App.3d 46, 58 Ill.Dec. 588, 592, 430 N.E.2d 620, 624 (5th Dist.1981). Roth cannot recover for Philipsborn's alleged breach where he did not first perform his duties under the contract.

5. The contract between Roth and Philipsborn (Exhibit 19) required that Roth satisfy Philipsborn that he had sufficient funds to complete the project over and above the amount of Philipsborn's construction loan to Roth. In this instance, such "satisfaction" clauses are subject to the court's interpretation that Philipsborn's reliance on such a clause is "just and reasonable". An Illinois reviewing court has stated:

> However, there is some Illinois case law regarding the interpretation of "satisfaction" clauses in general. In *Reeves & Co. v. Chandler,* (1903), 113 Ill.App. 167, 170, the court found that satisfaction clauses generally fall into one of two classes. In one class, the decision as to whether a party is satisfied is completely reserved to the party for whose benefit the clause is inserted, and the reasons for his decision may not be inquired into and overhauled by either the other party or the courts. Cases falling into this class generally involve matters which are dependant upon the feelings, tastes, or judgment or the party making the decision.
>
> The second class of cases are those in which the party to be satisfied is to base his determination on grounds which are just and reasonable. These cases generally involve matters which are capable of objective evaluation, or which involve considerations of operative fitness or me-

chanical utility. Matters of financial concern generally fall into the second category of cases. The adequacy of the grounds of a determination in this class are open to judicial scrutiny and are judged by a reasonable man's standard. *Foreman v. Benson*, 112 Ill.App.3d 1070, 68 Ill.Dec. 629, 632, 446 N.E.2d 535, 538 (2nd Dist.1983) (internal citations omitted). In other words, in the former class of cases, "satisfaction" may involve a matter of taste, while in the later class of cases, the court must look to whether a promisor's refusal to perform is reasonable. cf. *Corbetta Construction Company of Illinois, Inc. v. Lake County Public Building Commission*, 64 Ill.App.3d 313, 21 Ill.Dec. 431, 381 N.E.2d 758 (2nd Dist.1978).

■ 6. In this case the word "satisfied" in the contract should be interpreted in light of what was commercially reasonable under the facts of the transaction. Roth's conduct does not fall into the category of "matters which are dependant upon the feelings, tastes, or judgments of the party making the decision" under *Foreman v. Benson, supra*, 68 Ill.Dec. at 632, 446 N.E.2d at 538, but rather depends upon what a reasonable commercial man would do under the circumstances. Under this definition, Philipsborn's actions were reasonable in light of Roth's failure to fulfill necessary conditions precedent to Philipsborn's performance.

7. Philipsborn's commercial reasonableness can be demonstrated by looking at the terms of this transaction. In the Roth transaction, Philipsborn would have profited by taking a commission for making the loan to Roth and by earning the difference in interest between what Philipsborn paid its lender and what it charged Roth. Philipsborn took $5,000 in cash and a $35,000 note for the commission. The note was to be repaid from the funds Philipsborn would disburse to Roth when payments were first made. In other words, Philipsborn received only $5,000 from Roth, and would not receive any more commission or interest unless the project were completed.

8. Moreover, Philipsborn was at risk for the amount of its investment if the project started and was not able to be completed. The terms of the agreement between Roth, Philipsborn, and ManuLife called for ManuLife to make an end loan and then buy out Philipsborn's construction loan to Roth only if the project was substantially completed to ManuLife's specifications by December 1, 1979. It would be commercially unreasonable for Philipsborn to advance funds to Roth if Philipsborn were not satisfied that Roth could deliver a completed building and clear title by December 1, 1979, so as to satisfy ManuLife's requirements.

9. A reasonable commercial entity would have an incentive to lend Roth money, because only by lending money would that entity make money. But it would not be commercially reasonable to lend Roth money where Roth could not demonstrate he was in balance, did not submit or otherwise satisfy Philipsborn with his documentation, and was admittedly not ready to begin construction until at least June 28, 1979. The latter date was five months and two days before his end loan commitment was to expire and left only half the time (until December 1, 1979) his contractor estimated it would have taken to construct Farmgate II during good weather.

10. Roth has alleged in his adversary complaint that Philipsborn breached its contract with Roth to provide construction financing. Philipsborn has alleged in its answer that Roth failed to perform certain conditions precedent to receiving that financing. Under the pleadings and the statement of facts as agreed to in the Joint Pre-Trial Statement, Roth has the burden of proving that Philipsborn breached its contract. With respect to conditions precedent, an Illinois reviewing court has stated:

> We agree with the general principle cited by the defendant that a plaintiff must allege and prove performance of all conditions precedent and a tender or offer to perform those conditions which are concurrent or mutual and further we agree with the general proposition that

where two parties to a contract are in default neither can recover.

*Ross v. Danter Associates, Inc.*, 102 Ill. App.2d 354, 242 N.E.2d 330, 333 (3rd Dist. 1968). Thus, in order to recover in this action, Roth has the burden of proving that he complied with all of the contractual conditions precedent, but that Philipsborn unreasonably refused to fund the construction loan.

11. Roth cannot demonstrate that he fulfilled the conditions precedent to his receiving funds from Philipsborn. He cannot do this because his loan was not in balance at any time prior to the funding of Manu-Life's end loan, he never fulfilled the documentation requests of Philipsborn, that partial compliance with Philipsborn's request for documentation was too late to constitute substantial compliance and construction was begun too late to comply in time with ManuLife requirements.

██ 12. Accordingly, this Court has concluded:

(a) Philipsborn and Roth entered into a written agreement for Philipsborn to make to Roth a construction loan and an end loan.

(b) Both agreements contained certain conditions precedent which Roth had a duty to fulfill or perform before Philipsborn had a duty to disburse construction or end loan funds.

(c) Roth did not fulfill the terms and pre-conditions of the construction loan agreement.

(d) Philipsborn had no duty to disburse funds on the construction loan if Roth had not satisfied all of the terms and pre-conditions of his construction loan and end loan.

(e) Philipsborn had no duty pursuant to the construction loan agreement to disburse funds to Roth prior to the time that Roth had qualified for an end loan by fulfilling all of his duties of documentation pursuant to the end loan commitment.

(f) Philipsborn had no duty pursuant to the end loan agreement to extend its commitment to make an end loan past December 1, 1979.

(g) Roth had the burden of proof at trial to demonstrate that he had fulfilled or performed all of the pre-conditions of the construction and end loan agreements.

(h) Roth did not prove at trial that he performed all the pre-conditions which gave rise to a duty in Philipsborn to disburse funds under the construction loan.

(i) In light of Roth's failure to perform, Roth did not prove that Philipsborn acted in a commercially unreasonable manner in refusing to disburse construction loan funds to him.

██ 13. Likewise the Note on which the Counterclaim was based was not intended to become due unless and until the construction loan opened. Since that loan never opened, the precondition to the obligation did not occur and the Counterclaim must fail.

## ORDER

IT IS ORDERED THAT:

1. Judgment will be entered in favor of adversary-defendant H.F. Philipsborn and against plaintiff Richard L. Roth on the Adversary Complaint that plaintiff shall take nothing by its Complaint.

2. Judgment will be entered in favor of Adversary Counter-defendant Richard L. Roth and against Adversary Counter-plaintiff H.F. Philipsborn & Company on the Adversary Counterclaim that Counterplaintiff shall take nothing by its Counterclaim.