582 So.2d 387 (1991)
GEORGE B. GILMORE COMPANY
v.
Jimmy E. GARRETT.
No. 07-CA-59155.
Supreme Court of Mississippi.
April 24, 1991.
Rehearing Denied July 31, 1991.
*388 James H. Herring, Herring, Long & Joiner, Canton, for appellant.
C.R. Montgomery, Montgomery Smith-Vaniz Firm, Canton, Rebecca B. Cowan, Montgomery Smith-Vaniz McGraw, Jackson, for appellee.
Mark D. Herbert, Victoria W. Thomas, Ott Purdy & Scott, Jackson, for amicus curiae.
En Banc.
HAWKINS, Presiding Justice, for the Court:
George B. Gilmore Company has appealed a judgment in the circuit court of Madison County in favor of Mr. and Mrs. Jimmy E. Garrett in the amount of $13,000 in a suit charging Gilmore with the negligent construction of their house. The Garretts have cross-appealed. In this opinion we address the question of negligence in performing a contract and there being evidence to support Gilmore's negligence in performance of his obligations, especially his failure to give any warning of yazoo clay, we affirm. Because of the error in a jury instruction authorizing a reduction in damages insofar as the negligence of a prior owner may have contributed to the cause of the damage to the house, we reverse and remand on cross-appeal.

FACTS
In 1977 Mr. and Mrs. William R. Yates were desirous of building a residence in Madison County. Yates was completing six years of service in the U.S. Navy, where he had been promoted from an enlisted man to a commissioned officer in a construction battalion ("Seabees"). Yates held a degree in landscaping from Mississippi State University, which he described as one-half architecture and one-half civil engineering.
The Yateses engaged the services of a local realtor and selected a three-acre sloping tract. Yates was eligible for a Veterans Administration (VA) guaranteed loan, and Kimbrough Investment Company was the lender secured by the realtor. George B. Gilmore Company, a Jackson corporation in which Gilmore was the sole shareholder, agreed to be the builder.
The Yateses, Gilmore and the realtor met, and the Yateses selected a ranch style three bedroom house from a catalogue, but excluding the fireplace. They made a $5,000 down payment, with the entire balance to be financed by the VA secured loan.
The lot was deeded to Gilmore, and upon completion of the house, the property was conveyed by Gilmore to the Yateses.
Gilmore testified that the plans and specifications were furnished to him. Presumably the plans and specifications were obtained from the company which published the catalogue.[1]
Gilmore explained the procedure in VA guaranteed loans. The mortgage company requested the VA appraisal. A VA appraiser then appraised the land and proposed house, and Gilmore agreed to build it for the appraised value.
The lot was then cleared, and soil was filled in on the lower ground of the lot where the house was to be located, and the lot leveled. "[T]hen you go ahead and dig your slab and put your plumbing in, wire mesh and steel, and then you call for an inspection." He said that the trenches were usually a foot wide and dug "eighteen inches or to firm soil." Following this, a VA inspector would come and determine if the foundation was proper for the remaining construction.
Gilmore continued, "The work has to be done in a neat, workman-like manner to *389 meet the plans and specifications that is furnished or in conformity with them." In this case the inspector came and approved the proposed foundation. Following this, a concrete slab floor was poured. During the construction of the house there was a second inspection after the house had been "blacked" or framed in. Then there was a third and final inspection upon the completion of the house. The house was constructed in accordance with the plans and specifications and approved by the VA inspection. Following completion, the VA required a one-year warranty from the builder.
Gilmore made no soil borings or any other soil test preparatory to construction, nor did he advise the Yateses that any such test should be made. In 1977 there was no custom or practice in the local building trade to make soil tests for residences in Madison County, and still was not at the time of trial in January, 1988, according to Gilmore. Neither the VA nor the Federal Housing Administration (FHA) required soil testing. Gilmore did concede that with the present knowledge of Madison County soils, on expensive homes he would warn the prospective owner of a need for soil testing.
In 1977 the builders relied solely upon VA and FHA guidelines and inspections as to their responsibility on foundations.
The Yateses gave Gilmore no instruction as to the foundation or construction of the house, relying instead upon the plans and specifications, Gilmore and VA inspections. Yates was surprised at the amount of fill dirt required on the back side of the house, but other than that, was satisfied with the construction.
In September, 1980, the Yateses sold the property to Mr. and Mrs. Jimmy E. Garrett. The Yateses had experienced no problems with the house during their occupancy, nor did the Garretts until the summer of 1984. At that time the house developed serious cracks, dropping six to eight-and-one-half inches on one end, and wide cracks appeared in the exterior and interior walls and ceiling. The floor also cracked.
Four to five feet beneath the surface of the soil in this part of Madison County there is a "yazoo clay" formation which has a marked expansion or contraction depending upon the water absorbed into it, or drained from it.
The Garretts sued Gilmore in the circuit court of Madison County in July, 1986, alleging breach of an implied warranty to build the house in a workmanlike manner, and also negligence in construction.
Charles R. Furlow testified as an expert on behalf of the Garretts. Furlow held a master's degree in civil engineering, and was a consulting engineer with a specialty in geotechnical engineering.
Preparatory to testifying Furlow made an inspection of the house and did numerous soil borings. He took measurements of the footing to determine settling. He testified to the defects above noted, and described getting the sensation of the floor "tilting" in one room.
He said the yazoo clay was a "very expansive material," and the "volume changes are very large when water is added or water taken away from it." Adding water would cause the foundation to swell and you would see signs of it, and taking the moisture away would also be evident by settlement and cracking of the structure. It was his opinion that the house had an improper foundation, with yazoo clay just a few feet below the surface, and the expansion and contraction of the clay caused the settling and cracking.
In order for a builder to protect a structure on a yazoo clay subsurface, Furlow said he should first bore to determine the depth of the clay, and if within a few feet of the surface he could select one of three courses. He could clear all vegetation, and then bring in enough of the proper type of fill material of sufficient depth to create a buffer over the clay. This would cost $1,500 to $2,000.
Second, he could remove the soil down to the clay and replace it with material "that is needed to keep the clay from expanding and contracting." This would cost around $4,000.
*390 The third choice was a deep foundation on a series of concrete piers dug deep into the soil, entailing an expense of approximately $15,000.
Furlow said the cost of making a soil boring test was $600-$800.
Furlow testified a house should not be constructed without a soil test, and when yazoo clay was found close to the surface as in this case, one of these procedures should be followed. Failure to do so would result in moving and cracking a structure as occurred to the Garrett's house. He testified that yazoo clay had been known to exist in Madison County and this area of the state at least since the 1950s, and perhaps before. There were maps of the various soils published in 1960 showing the location of yazoo clay, which could be purchased for $1.50. He also stated that in the past ten years his firm had done 40-50 jobs in the town of Madison where there was a yazoo clay formation.
He testified no method of repair, mud jacking or concrete pad would be permanent, but would have to be repeated every few years. Furlow also stated that the problem with the house was not caused by poor drainage away from the foundation.
Furlow read the 1976 edition of the Southern Building Code:
"Footings and Foundations." (E)
When it is definitely known the top or sub-soils are of a shifting or moving character, all footings shall be carried to a sufficient depth to ensure stability. The excavation around piers shall be back filled with soils or materials which are not subject to such expansion or contractions.
The witnesses for the defense, including Gilmore, expressed the opinion that poor drainage away from the house caused the problem. R.C. Carter, a soil expert, while testifying poor drainage caused the problem, conceded yazoo clay caused the expansion, and a builder should be careful on this type of sub-soil. Ben L. McMillin, a home builder, testified there was no trade custom to make soil testings in Madison County. He conceded that yazoo clay formations in Madison County were known in 1977. Ralph E. Rives, an appraiser and developer, testified that the FHA and VA were the best standards in the United States for single-family dwellings, and that neither of them had ever required soil testing. Other witnesses for the defense corroborated Gilmore's opinion that inadequate drainage away from the house caused the problem, and there was nothing about the construction which caused it.
The jury returned a verdict for the Garretts for $13,000. Gilmore has appealed, and the Garretts cross-appealed.

LAW

I. SUFFICIENCY OF THE EVIDENCE
Gilmore first argues sufficiency of the evidence to support the verdict, claiming that it is not only against the overwhelming weight of the evidence, but is contrary to the law. In support of this Gilmore points out the uncontradicted proof that he built the house in accordance with the plans and specifications, the VA guidelines, and there was no practice or custom in the trade in Madison County in 1977 to make soil borings or testing for yazoo clay.
In Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670 (Miss. 1983), in which we removed privity as a requirement to maintain a suit for defective construction of a residence, we made the following observation:
The purchase of a home is quite frequently the most important and expensive investment that a family makes. Yet, most purchasers simply do not have the knowledge or expertise necessary to discover many defects. They must instead rely upon the honesty and expertise of the builder. Consequently, if the home is poorly constructed with latent defects, the purchaser may very well be subjected to a major financial catastrophe against which he has no practical means of protecting himself.
Under such a scenario, it is rather obvious that the courts must fashion some legal framework in which to protect innocent purchasers. Accordingly, we have already recognized that a first purchaser should be able to recover damages from *391 the builder if the builder was in some way at fault for the loss. That is how it should be. Certainly, an innocent purchaser should not be forced to sustain a heavy financial loss when the builder, through his own negligence or his own failure to construct the house in a workmanlike manner, caused the defect.
... .
... The builder already owes a duty to construct the home in a workmanlike manner and to construct a home which is suitable for habitation... .
The same reasoning is true with respect to the homebuilder's potential liability on a negligence theory. Since the doctrines of caveat emptor and merger no longer stand in this jurisdiction, the builder of a house is required to exercise reasonable care in the construction of said house.
439 So.2d at 671-672, 673. Also, May v. Ralph L. Dickerson Constr. Corp., 560 So.2d 729 (Miss. 1990).[2]

II. DUTY UNDER CONTRACT
In Pinnix v. Toomey, 242 N.C. 358, 362, 87 S.E.2d 893, 897-898 (1955), a suit against a plumber, the North Carolina Supreme Court held:
... Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law... . The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others... . Moreover, while this duty of care, as an essential element of actionable negligence, arises by operation of law, it may and frequently does arise out of a contractual relationship, the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract... . But it must be kept in mind that the contract creates only the relation out of which arises the common-law duty to exercise ordinary care. Thus in legal contemplation the contract merely creates the state of things which furnishes the occasion of the tort.
65 C.J.S. Negligence, § 4(6), pp. 494, 496 (1966) states the general rule:
... The question as to when and to what extent a recovery for negligence may be based on the breach of a contract obligation has been declared to be one of the moot questions of law. [p. 494]
.....
... Where a person contracts to do certain work he is charged with the common-law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract, and the parties may not substitute a contractual standard for this obligation. (Emphasis added) [p. 496]
... Accompanying every contract is a common law duty to perform with care, skill and reasonable experience, and a negligent failure to observe any of these conditions is a tort as well as a breach of contract.
Davis v. Anderson, 501 S.W.2d 459, 462 (Tex.Civ.App. 1973).

III. THE STANDARD OF CONDUCT
We can further refine the meaning of the above and oft-stated phrases "workmanlike manner" and "reasonable care and skill." Restatement (Second) of Torts, § 299A (1965) and pertinent portions of the comment state:
§ 299 A. Undertaking in Profession or Trade
Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in *392 the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.
Comment:

a. Skill, as the word is used in this Section, is something more than the mere minimum competence required of any person who does an act, under the rule stated in § 299. It is that special form of competence which is not part of the ordinary equipment of the reasonable man, but which is the result of acquired learning, and aptitude developed by special training and experience. All professions, and most trades, are necessarily skilled, and the word is used to refer to the special competence which they require. (Emphasis added)

b. Profession or trade. This Section is thus a special application of the rule stated in § 299. It applies to any person who undertakes to render services to another in the practice of a profession, such as that of physician or surgeon, dentist, pharmacist, oculist, attorney, accountant, or engineer. It applies also to any person who undertakes to render services to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber. This Section states that the minimum skill and knowledge which the actor undertakes to exercise, and therefore to have. If he has in fact greater skill than that common to the profession or trade, he is required to exercise that skill, as stated in § 299, Comment e.

.....
... It is a matter of the skill which he represents himself to have, or is understood to undertake to have, rather than of the skill which he actually possesses, or which the task requires.
In Firemen's Mut. Ins. Co. v. High Point Sprinkler Co., 266 N.C. 134, 146 S.E.2d 53, 59 (1966), a suit against a sprinkler system contractor, the Court held:
One who engages in a business, occupation or profession represents to those who deal with him in that capacity that he possesses the knowledge, skill and ability, with reference to matters relating to such calling, which others engaged therein ordinarily possess. He also represents that he will exercise reasonable care in the use of his skill and in the application of his knowledge and will exercise his best judgment in the performance of work for which his services are engaged, within the limits of such calling.
See also, Calderwood v. Bender, 189 Conn. 580, 457 A.2d 313 (1983).
The last three decades have given special impetus to these holdings. Public tolerance no longer exists in this country for shoddy products or services, whatever the source. Our law, foreign competition, and an alert public are teaching our professions, trades and industries the salutary, if painful, lesson that any success unattended by quality will be ephemeral. If the product sold or service rendered is less than the customer or client is fairly and reasonably entitled to expect under current and existing states of skill, knowledge and technology, our courts will afford relief.
In this case we have some basic questions.
Were the existence of yazoo clay and the potential problems to structures in Madison County a fact which builders in that area should reasonably have known in 1977?
Did Gilmore have a duty to warn the Yateses of a potential yazoo clay problem?
Should Gilmore have informed the Yateses that a soil test should be made before building?
Should Gilmore have constructed the house without making a soil test?
Should Gilmore have constructed a house with no allowance for the potential damage posed by yazoo clay just a few feet beneath the surface?
There was ample evidence before the jury that yazoo clay was the cause of the cracking and damage to this house. No one disputes that what happened to this house should not have happened. No *393 earthquake or tornado struck it. Nor did the Garretts experience some minor cracks such as can sometimes occur in masonry construction in even the best laid foundations on some soils. Major damage was done to this house. We can safely surmise that neither the Yateses nor the Garretts would have been remotely interested in purchasing the house had they anticipated this breakdown.
Nor were yazoo formations unknown to builders in this area of the state in 1977. Indeed, this Court handed down a decision in January, 1977, on severe structural problems to a building in Hinds County caused by yazoo clay, which was constructed in 1968. Dickerson Const. Co., Inc. v. Process Eng., 341 So.2d 646 (Miss. 1977). There was evidence of publications, easily available, as early as 1960 giving information on the soils and subsoils in Madison County.
The jury was warranted in concluding yazoo clay was a potential problem in Madison County of which builders should have been aware in 1977. Gilmore therefore had a duty to warn the Yateses of the potential problem and make a soil test before construction. This he failed to do.
[A] contractor who knows, or should know of a defect in a particular subsoil does not perform his contractual obligations in a workmanlike manner if he fails to notify the owner of the existence of the condition.
Annotation, Duty of Contractor to Warn Owners of Defects in Subsurface Conditions, 73 A.L.R.3rd 1213, 1215, (1976).
"Mr. Lewis (the contractor) had a duty to volunteer information as to the contents of the fill and underlying soil." Lewis v. Anchorage Asphalt Paving Co., 535 P.2d 1188, 1198 (Alaska 1975); Rippy v. Phipps, 475 P.2d 646 (Colo. App. 1970); Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (1967); Greneaux v. Castle I, Inc., 404 So.2d 309 (La. App. 1981) ("For the contractor has expert knowledge of such things, or should have, and he must bring these things to the attention of the owners, who have no knowledge of such affairs." 404 So.2d at 311) (quoting Wurst v. Pruyn, supra; Luxurious Swimming Pools, Inc. v. Tepe, 177 Ind. App. 384, 379 N.E.2d 992, 996 (1978); Dixon v. Ledbetter, 262 Ark. 758, 561 S.W.2d 294 (1978).
Had Gilmore taken the trouble to acquaint himself with the problem, he may not have wanted the contract to build the house in the first place. Or, the Yateses being warned may not have wanted a house on yazoo clay, either. This we can never know because Gilmore did not trouble his mind on this matter.[3]
The jury was warranted in finding Gilmore negligent in failing to warn the Yateses of a possible problem, and in undertaking to construct the house without making a soil test, and such failures alone or in combination proximately caused the damage to the house.
Moreover, having undertaken the job without informing the Yateses of the potential danger, Gilmore was under a duty to build it in a manner reasonably commensurate with the then existing skill, knowledge and technology prevailing in the construction industry to afford protection for a residential dwelling constructed over a yazoo clay foundation. White v. Mitchell, 123 Wash. 630, 213 P. 10 (1923); Rippy v. Phipps, supra; Wurst v. Pruyn, supra; Kavalaris v. Anthony Bros., Inc., 32 Cal. Rptr. 205, 217 Cal. App.2d 737 (1963); Dixon v. Ledbetter, supra; McFeeters v. Renollett, 210 Kan. 158, 500 P.2d 47 (1972); Terlinde v. Neely, 275 S.C. 395, 271 S.E.2d 768 (1980); 17A C.J.S. Contracts, § 515(e), p. 857: "As a general rule, the builder is responsible for defects caused by defects in the soil ..." Gilmore gave the Yateses no information as to yazoo clay, and made no allowance whatever in the foundation for *394 yazoo clay just a few feet beneath the surface.

IV. DID COMPLIANCE WITH PLANS AND CUSTOMS OF TRADE PRECLUDE RECOVERY?
There remains another hurdle to recovery, however. As we have noted, the jury had sufficient evidence to conclude that Gilmore as the contractor-builder would ordinarily be deemed negligent in having failed to warn the Yateses, and also having constructed the house with no allowance for yazoo clay. There is no dispute, however, but that Gilmore built the house in accordance with the plans and specifications therefor, and passed the VA inspections. Further, the strong weight of the evidence is that there was no custom or practice in the local building trade in Madison County in 1977 to make soil tests preparatory to constructing this type of dwelling.
Do these facts insulate Gilmore from any obligation to either warn or protect the house from this potential danger? Or, putting the question in another manner, can Gilmore legitimately claim that the absence of this requirement by the VA, the plans, and trade custom removed an obligation he otherwise would have had? The presence of such requirement by the VA, the plans, or trade custom would manifestly have created a duty. Hall v. Hilbun, 466 So.2d 856, 872 (Miss. 1985). Does the absence of any such requirement remove any obligation?
We hold that the VA standards, the plans and specifications and trade custom, while strong aids in answering the posed questions, are not in themselves conclusive. They do not as a matter of law absolve Gilmore under the facts of this case.
In The T.J. Hooper, 60 F.2d 737 (2nd Cir.1932), barges were lost in a storm. There had been storm warnings issued by radio, but the tugs were not equipped with receiving sets. One of the questions presented was whether the absence of radio sets capable of receiving storm warnings made the vessels unseaworthy. The defense was that such receiving sets were neither used by industry custom nor required in the coastal vessel transportation industry. Judge Learned Hand noted:
An adequate receiving set suitable for a coastwise tug can now be got at small cost and is reasonably reliable if kept up; obviously it is a source of great protection to their tows.
60 F.2d at 739.
The Court then held:
Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Ketterer v. Armour & Co. (C.C.A.) 247 F. 921, 931, L.R.A. 1918D, 798; [(2nd Cir.1917)] Spang Chalfant & Co. v. Dimon, etc., Corp. (C.C.A.) 57 F.(2d) 965, 967. [(2nd Cir.1932)] Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.
60 F.2d at 740.
In Helling v. Carey, 83 Wash.2d 514, 519 P.2d 981 (1974), an ophthalmologist was sued for failing to give a routine glaucoma test to a 32-year-old patient. His defense was that the incident of glaucoma in persons under 40 was 1/25,000, and the professional standards did not require routine glaucoma tests in patients under 40. The court noted that the test was inexpensive and simple. The court quoted the above language from The T.J. Hooper, supra, and from Texas & Pac. Ry. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905, 906 (1903), the following:
What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of *395 reasonable prudence, whether it usually is complied with or not.
The court then held:
Under the facts of this case reasonable prudence required the timely giving of the pressure test to this plaintiff. The precaution of giving this test to detect the incidence of glaucoma to patients under 40 years of age is so imperative that irrespective of its disregartd by the standards of the ophthalmology profession, it is the duty of the courts to say what is required to protect patients under 40 from the damaging results of glaucoma.
We therefore hold, as a matter of law, that the reasonable standard that should have been followed under the undisputed facts of this case was the timely giving of this simple, harmless pressure test to this plaintiff and that, in failing to do so, the defendants were negligent, which proximately resulted in the blindness sustained by the plaintiff for which the defendants are liable.
83 Wash.2d at 519, 519 P.2d at 983.
Indeed this very holding, albeit by dictum, was reiterated in Hall v. Hilbun, supra, a malpractice action in which we stated:

Conformity with established medical custom practiced by minimally competent physicians in a given area, while evidence of performance of the duty of care, may never be conclusive of such compliance. Cf. Helling v. Carey, 83 Wash.2d 514, 519 P.2d 981 (1974). The content of the duty of care must be objectively determined by reference to the availability of medical and practical knowledge which would be brought to bear in treatment of like or similar patients under like or similar circumstances by minimally competent physicians in the same field, given the facilities, resources and options available. The content of the duty of care may be informed by local medical custom but never subsumed by it. (Emphasis added)
466 So.2d at 872. Also, Berman v. Rubin, 138 Ga. App. 849, 227 S.E.2d 802 (1976) (as to attorneys).
As Courts have noted our law cannot permit the custom or current standards of a trade or industry in and of themselves to be the final arbiter of what reasonably should be expected by the purchaser. As observed in Dixon v. Ledbetter, supra, 561 S.W.2d at 295, "[t]hat a contractor uses customary methods is a matter to be considered, but that standard does not necessarily meet the test of ordinary care."
There can certainly be such a thing as customary negligence, as the unchecked habit of jay walking in some communities may support.
Even an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard.
Prosser and Keaton, Torts, Ch. 5, § 33, p. 194 (5th Ed. 1984).
As to the plans and specifications, in Wetmore v. Blueridge, Inc., 391 So.2d 951 (La. App. 1980), also involving a cracking floor because of soil, the Louisiana court of appeals observed, "[w]e cannot say under these circumstances that the mere construction of the home in accordance with the plans (which did not provide for reinforcement of the concrete driveway) entitles the builder to escape liability for resultant defects." 391 So.2d at 953. The Court also held:
It is well settled in the jurisprudence that a contractor is bound to warrant his work and is responsible for damages occasioned by defective workmanship or installation. It is implied in every building contract that the work will be performed in a skillful, careful, diligent and good workmanlike manner.
391 So.2d at 953. The contractor is "considered as having expert knowledge of such things and must bring them to the attention of the owners who have no knowledge of such affairs." 391 So.2d at 954.
In Luxurious Swimming Pools, Inc. v. Tepe, supra, 379 N.E.2d at 995, the Indiana Court of Appeals held that "the contractor owes the duty to examine such plans and judge of their sufficiency; that he is bound to discover defects that are reasonably discoverable or patent," and to point the defect *396 out to the owner. See also, Lewis v. Anchorage Asphalt Paving Co., 535 P.2d at 1199.
The foundation to any permanent structure is all important. To have a sound and workmanlike foundation, it is imperative that the builder take into account the soil and subsurface. This is especially true in areas where builders are familiar with certain subsoils and the hazard they create to structures, but of which the general public may be unaware. Reasonable care demanded of Gilmore, a builder in whom the Yateses placed confidence, that he inform them and warn them of the problem encountered with yazoo clay which was prevalent in this area of the state. He should have told them this created a potential problem if it were under this residence, and that the only way to know for certain was to make a boring and test the subsoil.
The jury was warranted in finding that this failure to warn was a proximate cause of the damages suffered by the Garretts, for which Gilmore should be held accountable.
It is, of course, true that a builder/contractor in an ordinary case should not be required to go beyond the plans and specifications, they after all being a part of his contract spelling out his obligations. See 65 C.J.S. Negligence, § 95, at 1059-60. Neither should plans and specifications which clearly do not take into account a construction problem of which the builder/contractor, the man with expertise should be well aware, remove from him all duty to warn. In such case the plans and specifications should not constitute an absolute defense.
The circuit judge did not grant any instructions on an implied warranty of habitability, and no cross-appeal on this question was taken by the Yateses. The distinction between the two concepts in a case such as this, however, is illusory. Keyes, supra, 439 So.2d at 673. An implied warranty of habitability is that the contractor-builder warrants the house has been built in a safe and workmanlike manner. A contractor-builder who fails to construct a house in a reasonably safe and workmanlike manner is negligent, in any event. 65 C.J.S. Negligence, § 4(6); Davis v. Anderson, supra.

V. VA DOCUMENTS
Gilmore took Garrett's discovery deposition, at which time Garrett produced copies of what are apparently compliance inspection reports on VA forms. These three sheets were given him by Yates when the Garretts purchased the house. Gilmore had no VA documents pertaining to his construction of the house, his own having been lost or destroyed. At trial he sought to introduce the documents Garrett produced at the deposition as authentic copies of the three VA inspection reports made in the construction of the house for the Yateses. The circuit court correctly excluded them. There was no showing that these were in fact true and correct copies of VA inspection reports on the construction of this house. Also, we have carefully examined the copies, which are for the most part illegible, and would undoubtedly have been more confusing than helpful to the jury's understanding.
Finally, even if the court had erred in excluding the documents, the evidence is uncontradicted that Gilmore complied with the VA inspections in constructing the house, and excluding these documents was clearly harmless.
We do not address the remaining assignment of error which we find without merit.
For the reasons stated this cause should be affirmed on direct appeal.

VI. THE CROSS-APPEAL
At trial defense witnesses testified that flower beds added by the Yateses next to the house prevented proper drainage away from the house, and that consequent seepage of water under the house either caused or contributed to the problems with the foundation and damage to the house. There was also defense testimony that a sidewalk constructed by the owners prevented proper drainage away from the house.
*397 Over the Garrett's objection, the court granted the following instruction on contributory negligence:
INSTRUCTION NO. 8
If you find from a preponderance of the evidence that the Defendant is liable to the Plaintiffs, but also find from a preponderance of the evidence that the Plaintiffs or the prior owners intentionally created conditions which affected the drainage around the dwelling and which they knew or reasonably should have known would adversely affect the foundation, and that such conditions, if any, proximately contributed to the failure of the foundation and damages resulting to the dwelling therefrom, then the Defendant in [sic] not liable to the Plaintiff for that part of the Plaintiff's or prior owners' acts and any damages which you may award to the Plaintiffs should be reduced by the amount which is attributed by you to acts of the Plaintiffs or the prior owners. (Emphasis added)
To the extent that the Garretts themselves negligently contributed to the problems with the foundation, the instruction was proper. The Garretts, however, should not be held responsible for the Yateses' negligence, if any, in contributing to the problem. Monroe County Elec. Power Ass'n v. Pace, 461 So.2d 739, 751 (Miss. 1984). Such negligence by the Yateses would only benefit Gilmore if it were the sole proximate cause of the damage. M & M Pipe and Pressure Vessel Fabricators, Inc. v. Roberts, 531 So.2d 615, 618 (Miss. 1988); Pargas of Taylorsville, Inc. v. Craft, 249 So.2d 403, 408 (Miss. 1971); Evans Motor Freight Lines v. Fleming, 184 Miss. 808, 185 So. 821 (1939).
We cannot hold that giving this instruction was harmless because the Garretts offered substantial evidence of greater monetary damage than the jury verdict.
We accordingly reverse and remand on the cross appeal. On remand the issue before the jury will be restricted to damages, and to what extent the negligence, if any, of the Garretts contributed to the damage to their house.
AFFIRMED ON DIRECT APPEAL; REVERSED AND REMANDED ON CROSS APPEAL FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., and ROBERTSON, SULLIVAN and PITTMAN, JJ., concur.
PRATHER, J., and DAN M. LEE, P.J., dissent. BANKS and McRAE, JJ., not participating according to Supreme Court Internal Rules.
PRATHER, Justice, dissenting:
The majority has concluded that the George B. Gilmore Company ("Gilmore") should be held liable for "negligent performance of a construction contract." Specifically, this conclusion is predicated upon Gilmore's construction of a house in an allegedly unworkmanlike manner  unworkmanlike because Gilmore did not test for and warn about the existence of subterranean Yazoo clay. I cannot, for the following reasons, concur in this logic.
In 1977, Gilmore entered into a contract with William Yates to construct a house on a traditional concrete slab foundation in Madison County for the sum of $47,000. Yates and a realtor had selected the house plans and specifications and presented them to Gilmore with instructions to construct the house accordingly  which Gilmore did exactly.[1] This contract was clear and unambiguous; it did not call for soil testing.
Numerous experts, including soil scientists, builders and building inspectors, testified unequivocally that soil tests were not customarily performed by builders of average skill and ordinary prudence in 1977 in Madison County. Soil tests were not even required by the FHA, VA, Madison County building inspectors, or the Southern Building Code. A builder conducted a soil test *398 only when Yazoo clay was visible to the naked eye or when a contract expressly called for testing.[2] In this case, the clay was several feet below the surface[3] and, as noted, the contract between Gilmore and Yates did not call for testing. See, e.g., Matthews v. Rudy, 4 La. App. 226 (1926) (where the court recognized the rule that a builder is not responsible for defects caused by the foundation giving way when it is due to latent defects in the soil).
In short, this is a contracts case, and this Court must decide whether Gilmore performed the duties which are discoverable within the contract's "four corners." Pursue Energy Corp. v. Perkins, 558 So.2d 349, 351-53 (Miss. 1990). No one disputes that Gilmore performed his contractual duties  i.e., the house was constructed according to plans and specifications provided him by Yates and the realtor. Rec. Vol. IV, at 56 & 62. Yates' testimony is supportive:
Q.: Okay, now how did you select your houseplans and the specifications and material that went into the house?
YATES: Basically it was a standard package. The houseplans were selected out of a catalogue.
Q.: And who helped, presented you with the catalogue?
YATES: The realtor.
Q.: And you don't recall who that was?
YATES: No, I can't. I can't remember the man's name.
Q.: Okay sir, and then these plans were presented to Mr. Gilmore, is that right?
YATES: That is correct.
Q.: Who presented them to him, if you know?
YATES: The realtor was the one who put us in contact with Mr. Gilmore.
Q.: And did you present the houseplans to him?
YATES: Well it was a joint meeting between myself, the realtor and Mr. Gilmore at that time.
Q.: And you instructed him to build your house in accordance with those plans and specifications?

YATES: That is correct.

Q.: And based on your prior testimony here today, as far as you are concerned, he did exactly that?

YATES: Correct.

Id. at 61-62 (emphasis added); see also id. at 217 (Gilmore's undisputed testimony revealed that "suitability of lot sites" is determined by the FHA and the VA); id. at 208-08 (Gilmore's undisputed testimony revealed that the various building inspectors approved the site preparation prior to the pouring of the foundation and that, without such approval, the foundation could not have been poured).
"[T]he rule has become well settled, in practically every American jurisdiction ..., that a construction contractor who has followed plans and/or specifications furnished by the contractee, his architect or engineer, ... will not be responsible to the contractee for loss or damage which results  at least after the work is completed  from the defective or insufficient plans or specifications." See Annotation, Responsibility of Construction Contractor or His Bond to Contractee for Defects or Insufficiency of Work Attributable to Plans and Specifications Furnished by Latter, His Engineer or Architect, 88 A.L.R. 797, 798 (1934). Builders provide no implied warranty for fitness where the plans and specifications are furnished by the contractee or other individual. See generally 17A C.J.S. Contracts § 329, at 292-95. Instead, the warranty provided is to construct the house in a workmanlike manner pursuant to the plans and specifications. Id. The exception to this rule is where the plans and specifications are so blatantly defective that a builder of "average skill and ordinary *399 prudence [is placed] on notice that the work is dangerous and likely to cause injury and that he should not attempt construction according to plans and specifications [; otherwise,] the builder is entitled to rely on the plans and specifications and is not chargeable with defects therein, and is not liable for injuries due to such defects." See 65 C.J.S. Negligence § 95, at 1059-60.
The majority has rewritten Mississippi law by creating an extra-contractual duty of soil testing. The majority then retroactively imposes this duty on Gilmore and concludes that the company is negligent for breach of a duty which was not even contemplated by the parties in 1977. As poignantly noted by a court in another jurisdiction: "We are aware of no rule of law that, absent a statutory or contractual obligation, requires a builder to investigate hidden subterranean conditions ... before embarking on a job." Pinkham v. Salyer, 115 A.2d 519, 520 (D.C.Mun.Ct.App. 1955). Instead, "a contractor [simply] has a duty to carry out the construction in accordance with the plans and specifications agreed upon." W.H. Lyman Constr. Co. v. Village of Gurnee, 131 Ill. App.3d 87, 86 Ill. Dec. 276, 284, 475 N.E.2d 273, 281 (1985) (citing Corbetta Constr. Co. v. Lake County Pub. Bldg. Comm'n, 64 Ill. App.3d 313, 21 Ill.Dec. 431, 381 N.E.2d 758 (1978)).
If the majority's objective is to enlarge the scope of a builder's duty by construing public policy as requiring soil testing prior to construction of a house or other structure, then fairness dictates that builders should be placed on notice and the rule made prospective in application. See Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 671-73 (Miss. 1983) (where this Court extended, but did not enlarge, a builder's duty by permitting subsequent purchasers with standing to sue for defective construction).
In sum, I cannot concur in the majority's conclusion that Gilmore should be deemed negligent for breaching a duty not imposed by contract, by custom, or by law. Gilmore indisputably constructed the house according to plans and specifications provided by Yates. He performed his part of the bargain, and he should not be penalized for not doing more than he was asked to do. Cf. Shore Drive Apartments, Inc. v. Frank J. Rooney, Inc., 253 So.2d 478, 479 (Fla.App. 1971) (where the court held that a builder who deviates from the plans and specifications provided him does so at his "sole risk").
DAN M. LEE, P.J., joins this dissent.
NOTES
[1] Gilmore himself did set out the work he was to perform and the materials he was to furnish on VA Form VB4-1852, a four-page "Description of Materials" form furnished by the VA, and which he filled in. Under the paragraph "Excavation," he typed in "to firm soil." The paragraph on "Foundation" was left almost entirely blank. Upon objection by the plaintiffs, this and other VA documents were excluded by the circuit judge.
[2] While not applicable to this case, it is worth noting that effective January 1, 1986, by Miss. Code Ann. § 15-1-41 (Supp. 1990), the Legislature enacted a six-year statute of limitations for any suit such as this.
[3] It is also significant that this failure to inform could very well have contributed to the Yateses' and Garretts' failure to take steps to protect the house. Defense witnesses testified poor drainage around the house was a cause of the clay expanding and cracking the house. Had the homeowners been aware of the danger of yazoo clay, they would have known the importance of seeing that the surface water was drained away from the house and not permitted to stand and seep into the ground.
[1] Indeed, as noted by the majority, the quality of Gilmore's work passed several VA and FHA inspections.
[2] According to one expert, Walter Cummins, a builder and real estate appraiser who testified at trial, Yazoo clay was not a problem in Madison County in 1977. See Vol. IV, at 184-85.
[3] Indeed, contrary to the majority's implications, no one disputes that Yazoo clay was not apparent before or during Gilmore's site preparation for the pouring of the foundation. See, e.g., Vol. IV, at 216.