660 So.2d 970 (1995)
Dollie H. CLARK
v.
ST. DOMINIC-JACKSON MEMORIAL HOSPITAL.
No. 92-CA-00443-SCT.
Supreme Court of Mississippi.
August 3, 1995.
Joe Sam Owen, Owen Galloway & Clark, Gulfport, for appellant.
Anne Clarke Sanders, Brunini Grantham Grower & Hewes, Christopher A. Shapley, Brunini Firm, Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
*971 HAWKINS, Chief Justice, for the Court:
Dollie H. Clark filed a wrongful death action on August 1, 1990, against St. Dominic-Jackson Memorial Hospital and Dr. James Hays for the death of her husband, Arthur Clark, in the circuit court of the First Judicial District of Hinds County. After discovery St. Dominic moved for summary judgment, which was granted. Mrs. Clark has appealed. St. Dominic has cross-appealed contending that sanctions should have been imposed against Mrs. Clark for various discovery violations.

FACTS
On Saturday July 30, 1988, Arthur Clark, a circuit court judge, at his home in Indianola, began experiencing discomfort in his chest, and having a difficult time catching his breath. The next Monday Judge Clark and his wife went to a local doctor who recommended that he go to Jackson for an examination by a cardiologist, Dr. James Crosthwait.
Judge Clark and his wife arrived in Jackson the following Thursday for an appointment with Dr. Crosthwait. After conducting a physical, Dr. Crosthwait recommended that Judge Clark undergo a treadmill test for purposes of evaluating his cardiac functioning. Judge Clark did not perform well on the test, and Dr. Crosthwait then suggested that Judge Clark have a cardiac catheterization  a procedure by which the condition of coronary arteries can be determined. Judge Clark agreed.
Late Thursday afternoon Judge Clark was admitted to St. Dominic-Jackson Memorial Hospital. The catheterization was scheduled for the next morning, August 5. Prior to the procedure Judge Clark was asked to sign a consent form, which stated in part, "I also understand that the cardiac catheterization laboratory is equipped and personnel assisting the doctor are trained to handle emergencies that may arise in order to make the test as safe as possible." Mrs. Clark returned to Indianola.
The next morning, August 5, Judge Clark was taken to the catheterization lab. Dr. James Hays was the attending physician. During the procedure Dr. Hays found a serious lesion on Judge Clark's left coronary artery. Shortly after the catheterization was completed, Judge Clark began to experience chest pains, and ultimately went into cardiac arrest. Because both operating rooms were in use, bypass surgery could not be performed at St. Dominic. Dr. Hays was unaware that the operating rooms were in use when he began the catheterization. Thereafter, inquiries were made to determine whether other local hospitals had operating rooms available. Although numerous other measures were taken to try and save his life  including the use of an intra-aortic balloon pump  Judge Clark's condition worsened. He died in the catheterization lab at approximately 11:00 a.m.
At the time Judge Clark was admitted, it was not St. Dominic's policy to reserve operating rooms for patients undergoing routine cardiac catheterization. The guidelines for the American College of Cardiology recommend that catheterizations only be preformed at hospitals that have cardiac surgery capability. According to a number of hospital employees, several patients died while undergoing catheterizations before Judge Clark.
In her complaint, Mrs. Clark alleged that (1) St. Dominic had failed to provide the necessary emergency support facilities, and (2) St. Dominic had failed to fully disclose the nature of the catheterization procedure to Judge Clark before obtaining his consent. The hospital denied both charges.
During discovery Mrs. Clark designated three experts as potential witnesses. In his deposition, Dr. Nathaniel Reich, a specialist in internal medicine, stated that the facilities at St. Dominic were insufficient to provide minimally competent care, although he did not find that any hospital employee had acted negligently. According to Dr. Reich, Dr. Hays should have identified Judge Clark as a high risk patient and instructed the hospital to have an operating room available. Dr. Reich did admit that for routine diagnostic catheterization it was not necessary to have an operating room on standby. Dr. Reich stated that after Judge Clark's condition became serious he should have been transported *972 to a hospital that had an operating room available.
Dr. Yadin David, a biomedical engineer, was also deposed by the defense. Dr. David stated that he had examined the service records of the hospital's intra-aortic balloon pumps,[1] and found that they indicated some malfunction had occurred at approximately the same time Judge Clark was being treated. He also concluded that the consent form which Judge Clark executed was misleading in that it stated that the hospital was prepared to handle emergencies, and it failed to mention the risk of death.
Finally, Dr. Alan Kravitz, a board certified cardiologist, was deposed. Dr. Kravitz testified that in his experience catheterization patients were rated as being either high or low risk, and that for high risk patients an operating room was kept on standby. According to Dr. Kravitz, the attending physician should rate the patients, and then inform the hospital of their status. After reviewing Judge Clark's records, Dr. Kravitz found that he was a high risk patient. Although he stated that the hospital would not normally be liable if the attending physician failed to inform it of a patient's condition, Dr. Kravitz contended that the hospital should have required physicians to inform it of the condition of every patient prior to beginning a catheterization.

LAW

I. STANDARD OF REVIEW
This Court conducts de novo review of summary judgments entered by lower courts to determine whether genuine issues of material fact exist. In doing so, the non-movant is given the benefit of all reasonable inferences and interpretations which the facts may support. Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984). Should we find that issues of material fact exist, or if the undisputed facts can support more than one interpretation, we will reverse.

II. STANDARD OF CARE
It is important to note that this case does not concern physician malpractice. Absent special circumstances, a hospital may not be held liable for a physician's malpractice. However, it may be liable for its own negligence and the negligence of its employees. Boyd v. Lynch, 493 So.2d 1315, 1318-19 (Miss. 1986). As is true of all negligence actions, a hospital must exercise reasonable care in preventing foreseeable injuries to foreseeable plaintiffs. Swan v. I.P., Inc., 613 So.2d 846, 856 (Miss. 1993); Boyd, at 1319.
Mrs. Clark's first claim against St. Dominic focused on the hospital's failure to provide adequate facilities and support staff. Prior to Judge Clark's death, a number of patients had experienced difficulty while undergoing catheterizations at St. Dominic.[2] In some of those cases, the patients were taken to an operating room for bypass surgery, while in others the patients were treated in the catheterization lab because an operating room was unavailable. An undetermined number of patients had died at St. Dominic during the catheterization procedure. Accordingly, the hospital was on notice that people might die as a result of the procedure.
St. Dominic counters by contending its conduct was appropriate under the applicable standard of care. In particular, it notes that operating rooms are not normally reserved for patients undergoing routine cardiac catheterizations.[3] St. Dominic contends that only when a patient is classified as high risk should an operating room be kept on standby during a catheterization. Furthermore, the hospital argues  and plaintiff's experts seem to agree  that unless the attending physician notifies the hospital that a patient is high *973 risk, there is no duty to reserve an operating room, and that because it followed the customary practice of hospitals throughout the nation, it cannot be found liable. However, in George B. Gilmore Co. v. Garrett, we noted:
Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.
582 So.2d 387, 394 (Miss. 1991) (quoting The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.1932)). In the field of medicine, the Court has held:
Conformity with established medical custom practiced by minimally competent [hospitals] ... while evidence of performance of the duty of care, may never be conclusive of such compliance. The content of the duty of care must be objectively determined by reference to the availability of medical and practical knowledge which would be brought to bear in the treatment of like or similar patients under like or similar circumstances ... given the facilities, resources and options available. The content of the duty of care may be informed by ... medical custom but never subsumed by it.
Hall v. Hilbun, 466 So.2d 856, 872 (Miss. 1985) (citations omitted). The same is true of the instant case. Testimony from several employees indicated that the hospital was aware that catheterizations could be life threatening before the Judge Clark episode. Several patients had in fact died during catheterizations before. Despite this, the hospital continued to operate under its previous policy. Given that notice, it would not be unreasonable to conclude that the hospital failed to exercise reasonable care.
In assessing reasonable conduct, there is a vast difference between taking a chance when unavoidable and when avoidable. Taking a 1% chance when necessary might be exemplary, but taking the same chance when unnecessary might be negligence.
The hospital was on notice that (1) upon occasion the operating room would be needed because of an emergency arising during a catheterization procedure, and (2) when such a need did arise, it would be critically important to the life of the patient. Why else would the American College of Cardiology have recommended that such procedures only be performed at hospitals that have cardiac surgery capability?
Under such circumstances the hospital was under a duty to show, at least more than is shown in this record, why no operating room was kept available as a matter of course during catheterization procedures. If patients are undergoing procedures in one part of a hospital that can be life threatening, and there are known methods by which physicians can meet such emergencies which are available in another part of the hospital, the question naturally arises, why should hospital regulations permit any life threatening procedure without also having safeguards in place? St. Dominic favors us with no such explanation.
Giving Mrs. Clark the benefit of all reasonable inferences, genuine issues of material fact did exist. The summary judgment entered in favor of St. Dominic is, therefore, reversed.

III. MISREPRESENTATION?
Prior to undergoing the catheterization, Judge Clark was required to sign a consent form. The form stated in relevant part:
I have been informed by Doctor Hays that there are possible, but infrequent, complications from this procedure such as irregular heart beat, heart attack, stroke, loss of pulse in the arm or leg or allergic reaction to the x-ray dye and that medical or surgical treatment may be required to attempt to correct these complications. I have been informed that the usual risk is less that [sic] one percent (1%) and that the procedure provides valuable information which outweighs the potential risk involved. I understand that the test is recommended so that my physician may better diagnose and treat my condition and *974 that heart disease can be potentially very serious, especially without proper diagnosis and treatment. I also understand that the cardiac catheterization laboratory is equipped and personnel assisting the doctor are trained to handle emergencies that may arise in order to make the test as safe as possible. (Emphasis added.)
Deposition testimony indicated that the form had been prepared by St. Dominic with physician assistance. Mrs. Clark contends that the consent form amounted to a misrepresentation. As a general matter, a physician is under a duty to inform a potential patient of the known risks and circumstances associated with a course of treatment so that the patient can make an intelligent decision about whether or not to proceed. Cole v. Wiggins, 487 So.2d 203, 205 (Miss. 1986). Failure to do so is negligence. While the Court's previous decisions on the matter have dealt specifically with the physician's duty to warranty." Boyd, at 1318. Mrs. Clark first contends that the consent form failed to mention death might result from the catheterization, and second, that the statements made in the form concerning the hospital's ability to handle emergencies amounted to misrepresentations.
Whether St. Dominic had an obligation to provide Judge Clark with such a consent form containing this language need not be addressed, but once it did so it was under an obligation to ensure that the information contained therein was accurate and not misleading.
The Restatement (Second) of Torts § 311 (1965) states:
(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
(a) to the other, or
(b) to such third persons as the actor should expect to be in peril by the taken action.
(2) Such negligence may consist of failure to exercise reasonable care
(a) in ascertaining the accuracy of the information, or
(b) in the manner in which it is communicated.
Similarly, in Berkline Corp. v. Bank of Mississippi, 453 So.2d 699, 702 (Miss. 1984), this Court determined that the elements of a negligent misrepresentation claim are: 1) a misrepresentation or omission of fact; 2) materiality; 3) the failure to exercise ordinary care; 4) reasonable reliance; and 5) injury. In terms of the instant case, the hospital's consent form failed to mention that death was a possibility, and indicated that the hospital was prepared to handle emergencies. A reasonable person might have concluded that should the need for emergency surgery arise, the hospital would be able to perform the operation. One of the plaintiff's experts even stated that St. Dominic's consent form was incomplete and misleading. Consequently, there were genuine issues of material facts surrounding the representations made in the consent form.
Accordingly, Mrs. Clark's assignment of error is well taken.

CROSS-APPEAL
After reviewing the record, the Court finds that there is no merit to St. Dominic's contention that the lower court erred by failing to sanction Mrs. Clark. With respect to this matter, the judgment of the trial court is affirmed.
ON DIRECT APPEAL: REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. ON CROSS-APPEAL: AFFIRMED.
PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS and SMITH, JJ., concur.
DAN M. LEE, P.J., not participating.
NOTES
[1] Such pumps are designed to reduce cardiac overload during cardiac arrest.
[2] The American College of Cardiology recommends that catheterizations be done at hospitals that have cardiac surgery capability. Mrs. Clark contends that because both of its operating rooms were occupied when Judge Clark entered cardiac arrest, St. Dominic actually had no capability for all practical purposes.
[3] At the time Judge Clark underwent the catheterization, Drs. Crosthwait and Hays termed the procedure routine. Plaintiff's experts, Drs. Reich and Kravitz, however, would have classified the judge as high-risk.