873 So.2d 140 (2004)
DiMA HOMES, INC., a Mississippi Corporation, Appellant,
v.
Matthew STUART and Wife, Nora Stuart, Appellees.
No. 2003-CA-00318-COA.
Court of Appeals of Mississippi.
May 11, 2004.
*141 Allen Flowers, Hattiesburg, attorney for appellant.
William L. Ducker, Purvis, attorney for appellees.
Before SOUTHWICK, P.J., LEE and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. A builder was ordered to pay damages for constructing a substandard home for the appellees. On appeal, the builder raises four issues: deposition testimony should not have been admitted; the homeowners are estopped from receiving equitable relief; no damages should have been awarded; and the amount of damages was excessive. We affirm.
¶ 2. In June 2000, Matthew and Nora Stuart contracted with DiMa Homes, Inc. for the construction of a $78,100 brick home on five acres in Lamar County. When DiMa concluded its work, the Stuarts believed that there were problems with workmanship. The Stuarts claim that they made DiMa aware of these issues during construction without receiving a satisfactory response.
¶ 3. On September 13, 2000, the Stuarts conducted a walk-through with DiMa and again pointed out problems that they believed needed correction. On October 4 and 19, 2000, DiMa worked on the premises. The Stuarts remained dissatisfied. They refused to close the loan for permanent financing. On November 6, 2000, the Stuarts received a demand letter from DiMa advising them that their continued delay would risk foreclosure of the deed of trust for $78,100. On November 14, 2000, the Stuarts closed the loan with Franklin American Mortgage Company for $80,000 to pay DiMa. The Stuarts claim that their accepting the house and finalizing financing with Franklin American was because of duress arising from the threat of foreclosure by DiMa.
¶ 4. The Stuarts then hired an attorney. A construction engineer was employed to inspect the home. A list of fifty-six matters that needed correction resulted from this inspection. In January 2001, the Stuarts provided DiMa a copy of the report from the construction engineer. DiMa was advised that the Stuarts expected within twenty days a statement of their intentions.
*142 ¶ 5. The complaint on which today's appellate opinion is the latest ruling was filed in March 2001. They sought $16,500 in damages. These were said to be the cost of necessary repairs. DiMa counterclaimed for damages.
¶ 6. A few months after filing suit, the Stuarts refinanced their home with Countrywide Home Loans for $92,800. Countrywide Home Loans appraised the property for an amount which exceeded the construction price.
¶ 7. At trial, the more significant problems alleged by the owners, as summarized in the chancellor's opinion, were these: "(a) the slab being cracked and uneven; (2) sheet rock being unfinished; (3) roof line sagged; (4) crooked brickwork; (5) doors not plumb; (6) dishwasher hookup problems; (7) stove clearance problems; (8) windows and shutters not straight; (9) columns crooked; and (10) fascia boards not square." Some of the details of the testimony follow.
¶ 8. Mrs. Stuart testified that the uneven slab, which she stated had caused "almost a hill in the breakfast nook," was discussed with DiMa before the house was finished. The flooring was taken up, the concrete in the breakfast area was apparently taken out with jack-hammers, and something called "Latacrete" was then poured on the slab throughout the house. She claimed that the effort to repair was unsuccessful.
¶ 9. Mrs. Stuart also testified that during construction a bathroom leak flooded the home and caused the sheetrock walls to bow. New baseboards were put on, but the sheetrock was not replaced. The sheetrock on the ceilings and elsewhere was said not to be properly finished. The tape and compound put on the seams were sloppily applied, and cracks and the edges of the tape were visible throughout. The kitchen cabinets were said to hang at an angle. Other problems were also detailed in testimony. During two walk-through inspections many of these problems were again pointed out to DiMa, and some painting was done as a result. No other repairs were made. DiMa's response at the time was that the Stuarts were being "nitpicky."
¶ 10. There was also testimony that the costs for necessary repairs included $10,800 for materials and labor, $2,200 for painting, and $3,500 for brickwork. The chancellor found that the house structurally was not substandard. The court also found, though, that the house contained defects in materials and workmanship. The Stuarts were awarded what they had sought except for the $3,500. The imperfections in the brickwork and the sag of the roof were found to exist but to be relatively minor. DiMa appeals; the Stuarts do not cross-appeal.

DISCUSSION
¶ 11. Four issues are raised on appeal. We combine two of them for discussion purposes.
Issue 1: Deposition Testimony
¶ 12. DiMa claims that the deposition transcript of a construction engineer should not have been admitted into evidence during trial. It claims that the transcript is hearsay but acknowledge that a civil rule permits controlled admission.
The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition.
M.R.C.P. 32(a)(3)(B). A complementary evidentiary rule provides that if the deponent is unavailable, "a deposition taken in *143 compliance with law in the course of the same or another proceeding" may be admitted. M.R.E. 804(b)(1). The objection raised at trial and here is that the witness was not shown to be unavailable.
¶ 13. The attorney offering the deposition indicated surprise that there was any objection to its use, as he had understood that the deposition could be used for any purpose. The chancellor noted that during the deposition, the Stuarts' attorney stated that "objections except those as to the form of the question will be reserved until such time as the deposition is offered into evidence." There was at least this much expectation from the time the deposition was taken that it would be used at trial. "Unavailability" is defined as being "absent from the hearing and the proponent of his statement has been unable to procure his attendance." M.R.E. 804(a)(5). The chancellor was told that the engineer was absent at a conference in New Orleans. DiMa's attorney said "he could be back this afternoon, but he was there yesterday." The engineer had not been subpoenaed by either party to attend the trial.
¶ 14. The chancellor found that the engineer's report, which listed fifty-six problems with the house, existed when the deposition was taken. DiMa therefore had an opportunity to question the engineer about the problems listed within his report. There was not, under the rules of evidence, any failure of opportunity or absence of motive for full cross-examination on the issues presented through the deposition and relevant to the case. M.R.E. 804(b)(1).
¶ 15. The principal question on this issue is the proof of actual unavailability. At least one of the attorneys believed or at least speculated that the witness might be returning from out of state before the trial was over. The firm evidence was that the engineer was not yet available and a question existed as to whether any possibility existed that he would become available. The chancellor found that the engineer was unavailable. Based on the evidence before him, that was a proper ruling. The admission was consistent with the rules of procedure and was within the chancellor's discretion. Robinson v. Lee, 821 So.2d 129, 133 (Miss.Ct.App.2000).
Issue 2: Equitable relief
¶ 16. DiMa claims that there is an estoppel here because the Stuarts represented in documents that they signed with two different lenders that the house was without deficiency or defect. Among them was a property settlement agreement containing such terminology.
¶ 17. The Stuarts point out that during trial DiMa neither made a specific objection nor asked the court for a ruling on the issue of this estoppel. The chancellor made no specific finding in reference to the property settlement agreement. We need not find a waiver, though the facts suggest that there may have been one, since the issue fails on the merits.
¶ 18. The Stuarts obtained initial financing from Franklin American Mortgage Company. During cross-examination Mr. Stuart stated that he advised Franklin American that he really did not accept the property in its present condition. The closing occurred anyway. Later, the Stuarts refinanced. This allowed a satisfaction of the Franklin American Mortgage note and the obtaining of a new loan with Countrywide Home Loans. The appraisal report from Countrywide stated, "no major repairs are needed that were obvious during inspection."
¶ 19. Whether the fifty-six items on the engineer's report were "major" repairs could be doubted. They were not structural in nature nor were they suggestive of hazardous conditions. We have already *144 summarized the more significant defects. Some of the less important ones are relatively innocuous "punch-list" matters, such as a smoke alarm that needed a battery, the absence of light bulbs in fixtures, the landscaping (which was not part of the contract with DiMa), the water needing to be turned on, and other matters of little cost. Not all of them were so easily or cheaply repaired, however.
¶ 20. There is no evidence that the Stuarts misled either mortgage company. Even if their home was sufficiently sound as to justify its being security for these loans, that does not answer whether it satisfied the contractual obligations of the builder. We find no estoppel, and now turn to the issue of the reality of the damages.
Issues 3 & 4: Damages
¶ 21. DiMa argues that no damages should have been awarded or at least not such a large award. DiMa had quality of workmanship obligations that arose from several sources. The contract itself provided a one-year warranty "on all structure, air conditioning and heat, electrical, and plumbing." As to cosmetic flaws, the Stuarts had to claim those at the end of construction during a contractually required "walkthrough." This "includes paint, floor and trim. At this time all surface flaws will be corrected," and DiMa would not be liable for any such problems that were later pointed out for the first time. Some of the problems set out in this litigation were pointed out during this time. Most of those for which damages were awarded do not fit within the surface flaw category of paint, floor and trim. Instead, a reasonable definition of "structure" in the contract would include such matters as the brickwork, the roof, the bowed sheetrock, and the kitchen cabinets being out of line.
¶ 22. Another obligation arose from the "New Home Warranty Act." Miss.Code Ann. §§ 83-58-1 through 83-58-17 (Rev. 1999). DiMa argues that section 83-58-5 makes it responsible only for "major structural defects." That language does appear and constitutes a warranty by the builder for six years. Id. A broader obligation lasts for a shorter period: "One (1) year following the warranty commencement date, the home will be free from any defect due to noncompliance with the building standards." Miss.Code Ann. § 83-58-5(1)(a) (Rev.1999). The statute defines this term:
"Building standards" means the standards contained in the building code, mechanical-plumbing code, and electrical code in effect in the county, municipality, or other local political subdivision where a home is to be located, at the time construction of that home is commenced, or, if the county, city, or other local political subdivision has not adopted such codes, the Standard Building Code, together with any additional performance standards, if any, which the builder may undertake to be in compliance.
Miss.Code Ann. § 83-58-3(b) (Rev.1999).
¶ 23. We find no evidence that the matters for which the damages were awarded constituted violations of a building code or other code. The statute's final reference to "additional performance standards," which is not a defined term, may incorporate such matters as were set out in the contract and which we have already discussed.
¶ 24. The Stuarts followed the procedural dictates of this Act. For example, there is a requirement that the owner give the builder an opportunity to correct the claimed problems:
Before undertaking any repair himself or instituting any action for breach of *145 warranty, the owner shall give the builder written notice, by registered or certified mail, advising him of all defects and giving the builder a reasonable opportunity to comply with the provisions of this chapter.
Miss.Code Ann. § 83-58-7 (Rev.1999). In January 2001, the Stuarts notified DiMa of their engineer's list of defects and demanded repairs. No response was received, and suit was filed.
¶ 25. The measure of damages is also controlled by this Act:
The damages with respect to a single defect shall not exceed the reasonable cost of repair or replacement necessary to cure the defect, and damages with respect to all defects in the home shall not exceed the original purchase price of the home.
Miss.Code Ann. § 83-58-15 (Rev.1999). The $13,000 awarded does not exceed the purchase price. We do not find evidence that the damages here were for matters that fell within this statute.
¶ 26. Regardless of the statute or the contract, every building contract has an implied term regarding reasonably skilled workmanship:
Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.
RESTATEMENT (SECOND) OF TORTS, § 299A (1965), quoted in George B. Gilmore Co. v. Garrett, 582 So.2d 387, 391-92 (Miss.1991). In that case, the court found that the builder "was under a duty to build [the home] in a manner reasonably commensurate with the then existing skill, knowledge and technology prevailing in the construction industry to afford protection for a residential dwelling constructed over a yazoo clay foundation." Id. at 393.
¶ 27. The judge found that DiMa failed in its obligation to build a home that met "customary standards of construction and is free of defects of materials and workmanship." There was substantial evidence for finding a violation of the duty just described. Whether it also was a breach of the contract or the statutory warranties ultimately is irrelevant. Damages were appropriate.
¶ 28. The measure of damages then becomes the question. When suit is brought over a construction contract, there are two methods for determining damages.
Where a building is completed, substantially according to plans and specifications, the measure of damages may be determined by: (1) the cost rule which is the cost of repairing the defects to make the building or structure conform to the specifications where such may be done at a reasonable expense if unreasonable economic waste is not involved, or (2) the diminished value rule which is the difference in the value of the property with the defective work and what the value would have been if there had been strict compliance with the contract.
Gerodetti v. Broadacres, Inc., 363 So.2d 265, 267-68 (Miss.1978), quoted in A & F Properties, LLC v. Lake Caroline, Inc., 775 So.2d 1276, 1281 (Miss.Ct.App.2000).
¶ 29. The "cost rule" allows recovery of the cost of repairing the defects to make the structure conform to specifications. However, such damages must not lead to economic waste. The chancellor's damage award was based on this principle. The alternative measure is the difference in the value of the construction as built when compared to a properly completed project. That measure is used when *146 awarding the cost to right what is wrong would be inequitable. Id.
¶ 30. The chancellor found that the house was not structurally substandard. However, he found defects in materials and workmanship that fell short of the terms of the contract between DiMa and the Stuarts. The chancellor discounted the $16,500 (materials and labor $10,800, paint $2,200, brickwork $3,500) estimate by the $3,500 for brickwork. In a bench trial, the chancellor determines the amount of damages. This amount will not be set aside unless it is unreasonable and outrageous. Miss. Dept. of Public Safety v. Durn, 861 So.2d 990, 998 (Miss.2003). We find the damage award to be reasonable, not to constitute waste, and to be supported by substantial evidence.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES, P.J., THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.